UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES L. SHELDON and SHIRLEY A. VEENEMA, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:22-cv-11198-IT |
| | * | |
| DT SWISS AG and MERLIN CYCLES, LTD., | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

MEMORANDUM & ORDER

December 6, 2024

TALWANI, D.J.

Plaintiffs James L. Sheldon and Shirley L. Veenema brought this products liability and negligence suit against Defendants DT Swiss AG ("DT Swiss"), a foreign corporation headquartered in Switzerland, and Merlin Cycles, Ltd. ("Merlin"), a foreign corporation headquartered in the United Kingdom. Sheldon alleges he sustained injuries when a DT Swiss bike part he purchased from Merlin malfunctioned. Veenema, Sheldon's wife, alleges loss of consortium due to Sheldon's injuries. The court granted DT Swiss's motion to dismiss for lack of personal jurisdiction and Plaintiffs' request for jurisdictional discovery as to Merlin. See Mem. and Order [Doc. No. 29]. After the Plaintiffs and Merlin conducted limited jurisdictional discovery, Merlin filed the pending Motion to Dismiss [Doc. No. 36], which Plaintiffs oppose [Doc. No. 40]. For the following reasons, Merlin's Motion to Dismiss [Doc. No. 36] is DENIED.

1

## I.    Background

As alleged in the Complaint, Plaintiffs Sheldon and Veenema are residents of Massachusetts. Compl. ¶¶ 4-5 [Doc. No. 1]. In September 2019, Sheldon purchased through Merlin's website a ratchet wheel mounting system ("RWS") manufactured by DT Swiss. Id. ¶¶ 18-19, 73. Merlin shipped the RWS to Sheldon's residence in Massachusetts. Id. ¶ 75. On September 29, 2019, after receiving and installing the RWS, Sheldon had a serious bicycle accident in Connecticut which he contends occurred when the RWS broke suddenly and without warning. Id. ¶¶ 1, 20. Plaintiffs claim the RWS was defective, and bring claims against Merlin for breach of warranty (for both a design defect and a manufacturing defect), and for negligence for marketing, selling, and distributing the defective product. Id. ¶¶ 69-107.

## II.    Jurisdictional Facts

### A.    *Factual Record Prior to Jurisdictional Discovery*

Merlin is incorporated and has its principal place of business in the United Kingdom ("UK"). Aff. of Andrew Oldham ("Oldham Aff.") ¶1 [Doc. No. 22-1]. Merlin has no officers or employees located in Massachusetts and has never assigned any officers or employees to work in or attend business meetings in Massachusetts. Id. ¶ 4. Merlin has never maintained offices, had a mailing address, owned or leased real estate, or maintained a telephone line in Massachusetts. Id. ¶¶ 5-6. In Massachusetts, Merlin has never paid taxes, owned any stock or commercial paper, registered to do business, held any licenses, or designated an agent for service of process. Id. ¶¶ 8-10.

Merlin sells bicycles, bicycle component parts, and bicycle clothing. Id. ¶ 2. It has one brick-and-mortar store in England and maintains a website where its products can be purchased

that is accessible to anyone. Id. ¶¶ 2, 13. Merlin ships orders made through its online store to the United States using a third-party carrier service. Id. ¶ 21.

Merlin has sent Sheldon approximately 728 marketing emails, including emails promoting the RWS. Aff. of James Sheldon in Supp. of Pls.' Opp. to Def. Merlin Cycles, Ltd.'s Mot. to Dismiss ("Sheldon Merlin Aff.") ¶ 5 [Doc. No. 23, Attach. A]. Sheldon has not opted in to receiving Merlin's marketing emails. Id. ¶ 6. He purchased the RWS from Merlin based on one of these emails, while a resident of Massachusetts, and the RWS was delivered to his home in Massachusetts. Id. ¶¶ 4b, 5, 14-15.

    *B.  Additional Facts Following Jurisdictional Discovery*

       1.  Business Description

Merlin describes its business as operating "an internet-based bicycle shop" and "a small retail store" in England. Answers to Jurisdictional Disc. Interrog. 13 ("Answers to Jurisdictional Disc.") [Doc. No. 37-1].

       2.  General Marketing

Merlin places advertisements in print magazines only in the UK. Id. at 8. Merlin also advertises via product reviews, where Merlin sends its products to third parties in the UK who publish reviews of those products in UK print magazines, or on the internet. Id. Merlin also advertised with Google Shopping. Id. at 8-9.

Merlin has not conducted advertisement campaigns targeted at specific geographic regions outside the UK. Id. at 9.

Merlin also sends newsletter marketing emails to individuals who either (a) subscribe to receive such correspondence through Merlin's website or (b) created an account on Merlin's website prior to 2018 and were automatically opted in to receive the correspondence. Id. at 5-6.[1]

Merlin has no record of the total volume of its marketing efforts as it pertains to the newsletter emails, targeted advertisements in the UK, or Google Shopping.[2] Id. at 6, 10.

3.  Email Communications With and Product Delivery to Sheldon

On June 6, 2017, Merlin sent an email in response to Sheldon's request on Merlin's website for an email notification when a particular product returned to stock. Ex. B, Tab 3 at 6 [Doc. No. 37-2]; Ans. To Jurisdictional Discovery, Ex. A, 11a [Doc. No. 37-1, ECF pg. 16]. At that time, Sheldon created a Merlin account registered to a Massachusetts billing address and Connecticut shipping address, using "eadweard@me.com" as his email address. Ex. B, Tab 3 at 5 [Doc. No. 37-2]; Ans. To Jurisdictional Discovery, Ex. A, 11b-c [Doc. No. 37-1, ECF pg. 16]. Sheldon received approximately seven emails from Merlin to the eadweard@me.com account regarding order confirmations and stock notifications. Id. Tab 3 at 6. Sheldon purchased a product at this time, which was shipped to Connecticut. See Ans. To Jurisdictional Discovery, Ex. A, 11b-c [Doc. No. 37-1, ECF pg. 16].

---

[1] Merlin sent weekly marketing emails on Mondays, Thursdays, and Fridays entitled "Monday Mega Deals," "Thursday Newsletter," and "Friday 10% of 10," respectively. Ex. B., Tab 6 (Email Records) [Doc. No. 37-2] Merlin would periodically send email advertisements highlighting a particular product or brand, showcasing new products in stock, and notifying customers about sales or offers. Id.

[2] Since 2014, when Merlin started using Mailchimp to send its newsletter emails to subscribers, approximately 1865 newsletter emails have been sent to subscribing customers, an average of two per week. Answers to Jurisdictional Disc. 5-6 [Doc. No. 37-1].

Sheldon registered another account with Merlin on November 27, 2018, using "eadweard@verizon.net" as his email address and a Massachusetts billing and shipping address. Id., Tab 5 at 19, 22. Sheldon received twelve emails regarding order updates this address. Id., Tab 5 at 28. On December 19, 2018, Sheldon placed a second order, this time with a billing address in CT. Ans. to Jurisdictional Discovery, Ex. A, 11b-c [Doc. No. 37-1, ECF pg. 16].

On February 22, 2019, Sheldon placed another order with a billing address and delivery address in Boston, MA. Id. This order contained the RWS at issue.

Pursuant to Merlin's automatic subscription default settings, Sheldon received approximately 350 generic newsletter emails to the eadweard@me.com account between June 6, 2017, and November 3, 2019, when he unsubscribed after the accident at issue here. Id. Tab 6 at 30-85. Sheldon never signed up for or received generic newsletter emails to the eadweard@verizon.net account.

### 4. Website Offerings

Merlin maintains a loyalty program pursuant to which purchasers earn "points" for signing up for the newsletter and making purchases, but that loyalty program is not and has never been made available to U.S. customers. Answers to Jurisdictional Disc. 12 [Doc. No. 37-1]. Merlin does not offer educational and consulting resources or advice other than through its customer service department, which anyone may contact to request assistance with "mail orders, product or delivery inquiries, general sale inquiries, and returns or refunds." Id. at 12.

### 5. Data Collection

Merlin has collected data specific to its website traffic. Id. at 10. Using Google Analytics, the data collected included which website pages were visited, the length of time spent on the pages, and the country the individual was in when the website was accessed based on the IP

address. Id. Merlin's website uses cookies to track each customer's currency, language, and country preferences. Id. Session cookies are also used to inform Merlin of the contents of customers' online shopping carts. Id. None of the data collected is specific to a particular state. Id.

      6.   Revenue

Merlin first started selling to customers in Massachusetts in 2012, about two years after entering the United States market. Ex. B, Tab 8 at 90-91 [Doc. No. 37-2]. Merlin's revenue has grown in Massachusetts every year since 2012 from £6,029.83 to £127,202.69 in 2019. Id. at 90. Merlin has also experienced year over year revenue growth in the United States and Worldwide over the same period.[3] Id. at 91-92. In 2018 and 2019, Merlin's total number of orders in Massachusetts was 736 and 772, respectively. Id. at 90. Nationwide during the same years, Merlin's order count totaled 29,191 and 32,957. Id. at 91.

## III.   Legal Standard

The exercise of personal jurisdiction over a defendant must be authorized by statute and consistent with the due process requirements of the United States Constitution. Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 712-13 (1st Cir. 1996); see also Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001). When a defendant challenges personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction exists. See Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015).

---

[3] Merlin's revenue grew in the U.S. from £351,442.94 in 2012 to £5,639,733.22 in 2019; worldwide Merlin's revenue grew from £10,047,122.58 in 2012 to £32,728,082.57 in 2019. Ex. B, Tab 8 at 91-92.

Where the court considers a Rule 12(b)(2) motion without holding an evidentiary hearing, as here, the court applies the "prima facie standard." Sawtelle v. Farrell, 70 F.3d 1381, 1386 n.1 (1st Cir. 1995). To make a prima facie showing of jurisdiction, a plaintiff must "proffer[] evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992). The court "must accept the plaintiff's (properly documented) evidentiary proffers as true," Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995), but the plaintiff must "go beyond the pleadings" and "provide affirmative proof of their jurisdictional allegations," Boit, 967 F.2d at 675, 681. Courts must also consider a defendant's undisputed jurisdictional facts. See Kuan Chen v. United States Sports Academy, Inc., 956 F.3d 45, 54 (1st Cir. 2020). Generally, courts considering jurisdictional claims are not required to "credit conclusory allegations or draw farfetched inferences." Lin v. TipRanks, Ltd., 19 F.4th 28, 33 (1st Cir. 2019) (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994)).

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." Cossart, 804 F.3d at 18 (quoting Sawtelle, 70 F.3d at 1387). Thus, to establish personal jurisdiction over the Defendants, Plaintiffs "must meet the requirements of both the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment." Id.

"The jurisdictional requirements imposed by the Massachusetts long-arm statute are quite similar to, though not completely congruent with, the jurisdictional requirements imposed by the Due Process Clause." Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016). Even where a party presents "jurisdictional facts sufficient to survive due process scrutiny, a judge would be required to decline to exercise jurisdiction if the plaintiff was unable

to satisfy at least one of the statutory prerequisites" of the long-arm statute. <u>Good Hope Indus.,
Inc. v. Ryder Scott Co.</u>, 378 Mass. 1, 6 (1979); <u>see also</u> <u>Burtner v. Burnham</u>, 13 Mass. App. Ct.
158, 161-62 (1982) ("It now appears to be recognized that application of [the Massachusetts
long-arm statute] requires that (even if the fact pattern of the case is constitutionally acceptable)
the circumstances of the particular case come within one of the specific subsections of [the
Massachusetts long-arm statute].")." "Because the [Massachusetts] long-arm statute imposes
specific constraints on the exercise of personal jurisdiction that are not coextensive with the
parameters of due process . . . a determination under the long-arm statute is to precede
consideration of the constitutional question." <u>Lopez v. AngioDynamics, Inc.</u>, 2021 WL 5040320,
at *4 (D. Mass. Oct. 28, 2021).

## IV.    Discussion

### A.  The Massachusetts Long-Arm Statute

The court finds that Plaintiffs have proffered sufficient evidence to confer jurisdiction
over Merlin under sections 3(a) and 3(b) of the Massachusetts Long Arm statute.[4]

### 1.   Subsection (a)

Under subsection (a) of Massachusetts's long-arm statute, a court may exercise personal
jurisdiction over an entity as to a cause of action arising from the entity's "transacting any
business in this commonwealth." M.G.L. c. 233A, §3(a). Courts "construe[] the 'transacting any
business' language of the statute in a generous manner," and focus on "whether the defendant
attempted to participate in the commonwealth's economic life." <u>United Elec., Radio and Mach.</u>

---

[4] The court previously found that jurisdiction cannot be exercised over Merlin under subsections
3(c) or 3(d), see Order on Mot. to Dismiss 14 [Doc. 29], and Plaintiffs do not argue otherwise
here.

Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1087 (1st Cir. 1992). In addition, in deciding whether a defendant has satisfied the "transacting any business" requirement, courts look to see whether, "but for" the defendant's actions in the commonwealth, "a train of events that results in the personal injury" would not have occurred. Tatro v. Manor Care, Inc., 416 Mass. 763, 770, (1994). In other words, "the plaintiff's claim must have arisen from the transaction of business by the defendant." Id.; see also Roberts v. Legendary Marine Sales, 447 Mass. 860, 863 (2006).

In Droukas v. Divers Training Academy, Inc., the Massachusetts Supreme Judicial Court ("SJC") endorsed the First Circuit's observation that "generally speaking, the Massachusetts courts would assert jurisdiction over a foreign corporation . . . whenever the corporation's activities affect the commerce of Massachusetts substantially so that the state has an interest in regulating the general conduct of those activities[.]" 375 Mass. 149, 154 n.5 (1978) (quoting Caso v. Lafayette Radio Elecs. Corp., 370 F.2d 707, 712 (1st Cir. 1966)). The SJC wrote that "[a]lthough these observations predate the enactment of [the long-arm statute], the effect of a nonresident's activity on the commerce of the Commonwealth is still an important factor to be considered in deciding the sufficiency of contacts with Massachusetts." Id.

At the same time, the "transacting business" test "is designed to identify deliberate, as distinguished from fortuitous, contacts with the forum by the nonresident party, with a view to determining whether 'the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable[.]'" Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112-13 (1st Cir. 1997) (internal citation omitted). The test is "importantly informed by ascertaining whether the nonresident party initiated or solicited the business transaction in Massachusetts." Id. at 113. In Droukas, the SJC found that the defendant's placement of an

advertisement in a publication distributed in the Commonwealth, receipt of a call and correspondence from the plaintiff in Massachusetts, and single shipment of goods "collect" to the plaintiff in Massachusetts were insufficient to come within subsection (a) of the statute. 375 Mass. at 153. Similarly, in Filmore v. VSP North America, LLC, 2019 WL 184075, at *6 (D. Mass. Jan. 14, 2019), defendant's single advertisement in the Boston Globe, intent to deliver an assigned receivable account to Massachusetts, and two related transactions were deemed insufficient for transacting business. And in Intech, Inc. v. Triple "C" Marine Salvage, Inc., 444 Mass. 122, 127 (2005), the SJC declined to extend long-arm jurisdiction for transacting business where defendants placed two advertisements in Massachusetts, had two sales to Massachusetts buyers, sent an invoice for sale and bill of sale to Massachusetts, and called Massachusetts to initiate sales.

Defendant maintains that its contacts with Massachusetts "were fortuitous – they were all incidental to independent actions of plaintiff and initiated by plaintiff . . . and those of other online customers." Mem. of Law ISO Def. Merlin Cycles, LTD.'s Renewed MTD 6 [Doc. No. 37]. But with over 700 orders amounting to over £127,202 in revenue in Massachusetts in 2019, Defendant's contacts with Massachusetts were not at all isolated or fortuitous. Even if Defendant only solicited individuals who first provided Merlin with their email address, Merlin's high number of sales in the Commonwealth, as jurisdictional discovery revealed, undermines its claim that its contacts with Massachusetts were fortuitous.

2. Subsection (b)

Under subsection (b) of Massachusetts's long-arm statute, a court may exercise personal jurisdiction over an entity as to a cause of action arising from the entity's "contracting to supply services or things in this commonwealth." M.G.L. c. 233A, § 3(b). Courts have construed "in this

commonwealth" to mean the place where the services or things are supplied, rather than the place where the contract was made. See Droukas, 375 Mass. at 157. Sheldon and Merlin had a straightforward contract for the provision of goods in Massachusetts. And under that contract, Merlin shipped the RWS to Sheldon in Massachusetts.

Relying on Droukas, Merlin contends that because it shipped the product to Sheldon via an independent third-party carrier, it cannot be considered responsible for the shipment of goods into the Commonwealth. But Droukas is distinguishable where the delivery was a "shipment contract," rather than a "delivery contract"; although the defendant "agreed to ship the [goods] to the plaintiff, there [was] no evidence that the defendant specifically contracted to deliver or supply the [goods] in the Commonwealth." Id. at 158. Unlike in Droukas or Intech, where the SJC found no basis for jurisdiction over defendants under subsection (b) because those defendants were not ultimately responsible for the shipment of the goods into the Commonwealth, Merlin was responsible for the transport of its goods to Massachusetts, despite its use of a third-party shipper. The court finds that Merlin contracted to supply goods or services in the Commonwealth for purposes of subsection (b) of the long-arm statute.

Accordingly, jurisdiction is appropriate under both subsections (a) and (b) of the long-arm statute.

B.  *Constitutional Due Process*

Merlin contends that Plaintiffs have not established that Merlin has sufficient minimum contacts with the forum to support specific jurisdiction or that Merlin purposefully availed itself of Massachusetts. Mem. ISO Def. Merlin Cycles, LTD.'s Renewed MTD ("Def.'s Mem.") 11-12 [Doc. No. 37]. Plaintiffs counter that Merlin advertised and marketed its products in Massachusetts, fostered ongoing connections in Massachusetts through its loyalty program, and

systematically served the Massachusetts market through its educational and advisory services. Pls.' Opp. & Mem. ISO Their Opp. to Def. Merlin Cycles, LTD's Renewed MTD ("Pls.' Mem.") 10 [Doc. No. 38].

This court previously determined that the constitutional requirements of personal jurisdiction were met based on the evidence then before the court supporting specific jurisdiction. Mem. and Order [Doc. No. 29]. In its renewed <u>Motion to Dismiss</u> [Doc. No. 37], Merlin requests that this court reconsider this finding based on the facts produced in jurisdictional discovery.[5] The court agrees that the constitutional requirements should be reconsidered in light of the additional discovery but again finds that the constitutional requirements are met for specific jurisdiction.

1. Specific Jurisdiction – Legal Standard

"Specific personal jurisdiction . . . may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" <u>Pritzker v Yari</u>, 42 F.3d 53, 60 (1st Cir. 1994) (quoting <u>United Elec. Workers</u>, 960 F.2d at 1088). "The three elements of specific jurisdiction are relatedness (the nexus of plaintiff's claim with the defendant's contact with the forum), purposeful availment (something more than an isolated contact or the unilateral activity of a third person), and the reasonableness of the exercise of

---

[5] Certain facts claimed by Sheldon that the court accepted in its order on Defendant's first motion to dismiss have been disproved by jurisdictional discovery. Specifically, Merlin has now offered uncontradicted evidence that it does not offers a loyalty program to Massachusetts residents and does not offer educational and advisory resources in Massachusetts, beyond a customer service department that any person may contact by telephone or email.

jurisdiction (the five Gestalt factors)." Warren Envtl., Inc. v. Source One Envtl., Ltd., 2020 WL 1974256, at *3 (D. Mass. Apr. 24, 2020) (citing Baskin-Robbins, 825 F.3d at 35). "Questions of specific jurisdiction are always tied to the particular claims asserted" and thus the inquiry must be conducted "on a claim-by-claim basis." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999).

"As the First Circuit has stated, the relatedness requirement—'that a suit arise out of, or be related to' [d]efendant's forum activities—'ensures that the element of causation remains in the forefront.'" Back Bay Farm, LLC. v. Collucio, 230 F. Supp. 2d 176, 186 (D. Mass. 2002) (quoting Ticketmaster, 26 F.3d at 206, 207). "Relatively speaking, the relatedness inquiry is to be resolved under 'a flexible, relaxed standard.'" Baskin-Robbins, 825 F.3d at 35 (quoting Pritzker, 42 F.3d at 61).

"[T]here is a natural blurring of the relatedness and purposeful availment inquiries in cases[] in which the alleged contacts are less tangible than physical presence; in such circumstances, an inquiring court must determine the extent to which the defendant directed an out-of-state activity at the forum state in order to ascertain whether the activity can be termed a contact at all." Phillips Exeter Acad., 196 F.3d at 289. "This determination bears at least a family resemblance to a determination of whether a defendant purposefully availed himself of the protections of the forum state. Notwithstanding this resemblance, however, the inquiries are different . . . ." Id. "The purposeful availment test focuses on the defendant's intentionality and is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 32 (1st Cir.

2010) (internal quotation marks and citation omitted). Under the third and final requirement, the exercise of jurisdiction must be "reasonable under the circumstances." Id. at 33.

### 2. Facts Relevant to Specific Jurisdiction

Based on the record following jurisdictional discovery, Plaintiff has established for purposes of the motion that (1) Merlin sent a high volume of marketing and promotional emails to one of Sheldon's email addresses, which was associated with a billing address in Massachusetts; (2) although Merlin engaged in this marketing only after Sheldon created an account on Merlin's website, Merlin then automatically sent those marketing emails to Sheldon pursuant to its pre-2018 account settings; (3) Merlin sent Sheldon an advertisement for the RWS system at issue in this case to the email address subscribed to Merlin's marketing emails; (4) Sheldon purchased the RWS after receiving that email, using a different email address, but which also had a Massachusetts billing address; (5) the purportedly defective product was shipped to Sheldon in Massachusetts; and (6) Merlin does a significant volume of sales in Massachusetts. The question is whether these facts support the court's exercise of personal jurisdiction over Merlin under the Due Process Clause.

### 3. Relatedness

To show relatedness, Plaintiffs must demonstrate that his "cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005). Merlin sent Sheldon an advertisement for the RWS, Sheldon purchased the RWS from Merlin, Merlin shipped the part to Massachusetts, and the RWS allegedly malfunctioned and caused his accident. This is sufficient to establish a "demonstrable nexus" between Merlin's forum contacts and Plaintiffs' cause of action. See Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).

4.  Purposeful Availment

The crux of the parties' disagreement is purposeful availment. Defendant contends that its "newsletter email communications and purchase order history" with Sheldon cannot support a finding that Merlin purposefully availed itself of the Commonwealth or that it could reasonably have foreseen being haled into court here. Plaintiff responds that Merlin's marketing efforts directed at Massachusetts residents and significant revenue derived from sales to Massachusetts-based individuals can provide the basis for specific jurisdiction, citing Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 9-10 (1st Cir. 2018).

Requiring that defendants have purposefully availed themselves of a jurisdiction ensures that the exercise of jurisdiction is essentially voluntary and foreseeable and is not premised on "random, fortuitous, or attenuated contacts." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). Foreseeability is a crucial element of the purposeful availment analysis, meaning courts should consider whether "defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." Id. at 474.

As the First Circuit has described it, "Supreme Court precedent does not establish specific targeting of a forum as the only means of showing that the purposeful availment test has been met." Plixer, 905 F.3d at 9. Considering the Supreme Court's plurality opinion in J. McIntyre Machinery, Ltd. V. Nicastro, 564 U.S. 873 (2011), and the majority and concurring opinions in Asahi Metal Indus. Co. v. Superior Ct. of California, 480 U.S. 102, 107 (1987), the First Circuit declined to adopt a rule that specific forum targeting is the only way to establish purposeful availment. Plixer, 905 F.3d at 10. Instead, the First Circuit held that specific personal jurisdiction could be exercised over a foreign company with a "regular flow or regular course of sales" in the United States. Id.

15

The record in Plixer did not reveal what percentage of the defendant corporation's overall business came from the United States but did show that defendant obtained its 156 forum customers through its website and that those contacts resulted in nearly $200,000 in business over three-and-a-half years. Id. The First Circuit held that defendant's "voluntary service of the U.S. market and its not insubstantial income from that market show that it could have 'reasonably anticipated' being haled into U.S. court." Id. The record here is similar and shows that Merlin did £5,639,733.22 worth of business in the U.S. in 2019 and £127,202.69 of that revenue came from Massachusetts customers.

Soon after Plixer, the First Circuit reiterated that a "regular flow or regular course of sales" can satisfy the purposeful availment requirement in Knox v. MetalForming, Inc., 914 F.3d 685, 692 (1st Cir. 2019). Rejecting defendant's argument that its Massachusetts sales should be discounted because those sales were part of a nationwide effort, not targeted at Massachusetts specifically, the First Circuit wrote: "the question is not whether a defendant sells its product across the U.S.; it is instead whether a defendant's forum connection is such 'that the exercise of jurisdiction is essentially voluntary and foreseeable.'" Id. at 692 (quoting Plixer, 905 F.3d at 7); see also Ainsworth v. Moffet Eng'g, Ltd., 716 F.3d 174, 179 (5th Cir. 2013) (upholding exercise of personal jurisdiction based on in-forum sales where defendant's forum sales represented only 1.55% of its nationwide sales during the relevant period). The court ultimately held that the volume of the defendant's sales coupled with evidence that defendant made "efforts to continue—and perhaps to expand—its relationships with Massachusetts purchasers" meant that defendant had purposefully availed itself of Massachusetts. Id. at 693.

The court acknowledges that the question of whether Merlin purposefully availed itself of Massachusetts is a close one. On the one hand, Merlin does a significant volume of sales in

Massachusetts, and that the revenue it derives from its sales to Massachusetts customers has increased more than twenty-fold since 2012. It can be inferred from this growth that Merlin has made efforts to expand its sales and marketing efforts, without excluding the Massachusetts market. On the other hand, Merlin does not design or manufacture its products with Massachusetts in mind, see Asahi, 480 U.S. at 112 (opinion of O'Connor, J.). Nor does it solicit customers who have not contacted Merlin first. See Marvix Photo, Inc. v. Brand Techs., 647 F.3d 1218, 1230 (9th Cir. 2011) (upholding exercise of personal jurisdiction over Florida defendant in California where defendant continuously and deliberately exploited the California market for its website).

Though a close call, the court finds that Merlin did purposefully avail itself of Massachusetts. Merlin conducts "a continuous and systematic, but limited, part of its general business" in Massachusetts, and this is sufficient to support jurisdiction where, as here, "the cause of action arises out of the very activity being conducted," in this case, the sale of bicycle parts. Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 779-80 (1984).

     5. Reasonableness

Finally, the court considers whether the exercise of personal jurisdiction over Merlin is reasonable. "[T]he Due Process Clause bars a court from asserting jurisdiction over the person of a defendant if doing so would be fundamentally unfair" and "gauging fairness requires an assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness." Ticketmaster, 26 F.3d at 210. In assessing reasonableness, courts consider five factors (the "Gestalt factors"): (1) the defendant's burden of appearance; (2) the forum state's adjudicatory interest; (3) the plaintiff's

interest in obtaining convenient relief; (4) the administration of justice; and (5) pertinent policy arguments. See Sawtelle, 70 F.3d at 1394.

Merlin argues that the Gestalt factors weigh in Merlin's Favor. It contends that requiring Merlin to appear in Massachusetts for depositions and trial would be an unreasonable burden, and that remote proceedings would also be burdensome given the time difference between Massachusetts and the United Kingdom.

The First Circuit has held that "the concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, we think this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64. The court does not find that the potentially difficulty of travel or remote proceedings with a time difference is not a special or unusual burden.

As for the other Gestalt factors, Massachusetts clearly has an adjudicatory interest in the dispute and in protecting its consumers, even though the accident occurred in Connecticut. The court's "task is not to compare the interest of the two sovereigns— the place of the injury and forum state—but to determine whether the forum state has an interest." Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 718 (1st Cir. 1996). This is particularly true here where jurisdiction over Merlin, an online retailer, would fare no better where the accident occurred.

On the renewed motion, the parties do not discuss the remaining Gestalt factors in any detail, but the court finds that Plaintiffs have an interest in convenient relief and that it should "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience." Ticketmaster, 26 F.3d at 211. It further finds that the administration of justice does not cut in either direction, and that any policy arguments have been waived.

18

Accordingly, the court finds that it can exercise personal jurisdiction over Merlin without offending constitutional due process.

V.    **Conclusion**

For the foregoing reasons, Merlin's <u>Motion to Dismiss</u> [Doc. No. 36] is DENIED.

IT IS SO ORDERED

December 6, 2024                                         /s/Indira Talwani

                                                        United States District Judge